# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ROSE HAYES**
       **Plaintiff,**

    **v.**                       **Case No. 11-C-0212**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
          **Defendant.**

---

## DECISION AND ORDER

The Seventh Circuit has in recent decisions noted persistent flaws in the Social Security Administration's handling of disability claims, including the use of boilerplate credibility findings to reject claimants' allegations, the failure to provide good reasons for rejecting treating physician opinions, and the deployment of post-hoc arguments by the agency's lawyers to defend the denials in court. E.g., Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011); Martinez v. Astrue, 630 F.3d 693, 694 (7th Cir. 2011); Spiva v. Astrue, 628 F.3d 346, 348 (7th Cir. 2010); Parker v. Astrue, 597 F.3d 920, 921-22 (7th Cir. 2010). Such errors are present in this case, commenced by plaintiff Rose Hayes, and cannot be deemed harmless. Therefore, I must reverse and remand for further proceedings.

## I. THE ADMINISTRATIVE RECORD

Plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging inability to work due to a variety of conditions, including back and knee pain, depression, rheumatoid arthritis, emphysema, carpal tunnel syndrome, and high blood pressure. (Tr. at 133-37; 168.) Denied initially (Tr. at 56-57) and on reconsideration (Tr. at 58-

59), plaintiff requested a hearing before an Administrative Law Judge (Tr. at 31, 88-91).

At the hearing, plaintiff testified that she lived alone in an apartment and spent most of her time at home watching TV, engaging in no outside social activities. (Tr. at 38-40.) She currently received no mental health treatment, but she had taken medicine for depression in the past. (Tr. at 40-41.) Plaintiff testified that she smoked a pack of cigarettes every three days but was trying to quit; she used "Advera" to help her breathing.[1] (Tr. at 41.) She also took blood pressure pills, "Miraplex" for restless leg syndrome,[2] and Vicodin for back and knee pain. She had undergone no surgeries for her conditions (Tr. at 42), nor had her doctors recommended any surgeries for her knees (Tr. at 49). Plaintiff testified that she sometimes dropped things, such as a cigarette, and got cramps if she used her hands a lot. (Tr. at 43.) She received some physical therapy for her back and carpal tunnel syndrome. (Tr. at 49-50.)

Plaintiff testified that she previously worked as a factory/assembly worker through temporary services, with her assignments typically last less than three months, and as a machine feeder. (Tr. at 44-48.) The ALJ summoned a vocational expert ("VE") to the hearing, and she classified plaintiff past work as a machine feeder as unskilled, light work, and an assembler as unskilled, light work. (Tr. at 48.) The ALJ then asked a series of hypothetical questions, assuming a person of plaintiff's age, education, and work experience. The first question presumed a person able to perform medium work, but limited to no more than

---

[1]I assume plaintiff meant "Advair," which is used to treat chronic obstructive pulmonary disease ("COPD"), including chronic bronchitis or emphysema. http://www.advair.com/. The medical records confirm that plaintiff's doctors prescribed Advair. (E.g., Tr. at 228.)

[2]The medical records indicate that plaintiff took "Mirapax" for this condition (E.g., Tr. at 322). Mirapax is used to treat Parkinson's disease and restless leg syndrome. http://restless-legs-syndrome.emedtv.com/mirapex/mirapax.html.

frequent bilateral fingering, and "no more than a concentrated exposure to irritants." (Tr. at 50.)

The VE testified that such a person could perform both of plaintiff's past jobs and could also

work as a cafeteria attendant, production helper, or packer/packager. (Tr. at 50.) The second

hypothetical further limited the person to occasional climbing of ladders, ropes, or scaffolds;

occasional stooping, crouching, kneeling, or crawling; and work limited to simple, routine, and

repetitive tasks. The VE testified that her responses remained the same. (Tr. at 51.) The third

question assumed a limitation to light work, with no more than frequent bilateral fingering and

no more than a concentrated exposure to irritants. The VE testified that this person could still

perform plaintiff's past work, both jobs, as well as work as a cafeteria dining room attendant

(light level), lobby attendant, cashier, and counter clerk. (Tr. at 51-52.) The ALJ's fourth

question added the same postural limitations and requirement of simple, routine, repetitive

tasks as in question two, and the VE testified that her answer was the same as to question

three. (Tr. at 52.) Adding to hypothetical four a limitation to occasional use of the hands

eliminated the past work as well as the cashier and cafeteria jobs, but the lobby attendant and

counter clerk positions would remain; adding the further limitation of standing less than two

hours per workday, however, these jobs would be eliminated. (Tr. at 54.)

The VE further testified that if the person could not engage in sustained work activity on

a regular and continuing basis competitive work at all exertional levels would be precluded.

The VE said that employers typically tolerate one un-excused or unscheduled absence per

month, none during the probationary period. (Tr. at 53.) Thus, three or more absences per

month would eliminate the jobs identified. (Tr. at 54.) Employers permit one thirty minute

break and two fifteen minute breaks; exceeding those limits on a customary basis would also

preclude the jobs cited and work in the competitive workplace in general. The VE stated that

3

her responses were consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 53.)

The ALJ also collected plaintiff's treatment records from Milwaukee Health Services, Inc./MLK Center. The notes are handwritten and at times hard to read, and plaintiff's treatment appears to have been sporadic.

On December 18, 2000, plaintiff was seen for a check-up and pap smear. (Tr. at 239.) On April 11, 2002, she was a no-show for her appointment. (Tr. at 239.) On June 20, 2002, she was seen as a walk-in complaining of shortness of breath and wheezing. (Tr. at 239.) The doctor assessed acute bronchitis, rule out pneumonia, and possible chronic obstructive pulmonary disease ("COPD"). Plaintiff felt better on receiving treatment, with minimal wheezing, but was nevertheless directed to the emergency room for admission. (Tr. at 238.) The ER later called the MLK Center, indicating that plaintiff was doing better. She was sent home on Ventolin (i.e., Albuterol)[3] and Prednisone.[4] (Tr. at 237.)

On November 15, 2002, plaintiff came in for a regular check up. The doctor assessed her as post-menopausal, providing Premarin (i.e., estrogen)[5] and diagnosed chronic low back pain, providing Flexeril[6] and Ibuprofen and considering a referral to physical therapy. (Tr. at 237.)

---

[3]Albuterol is used to treat wheezing, difficulty breathing, and chest tightness caused by lung diseases such as COPD. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000355/.

[4]Prednisone is used alone or with other medications to treat the symptoms of low corticosteroid levels. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000091/.

[5]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000806/.

[6]Flexeril, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699/.

4

On December 9, 2002, plaintiff came in for a complete physical. Her low back pain had resolved, and she reported no other complaints. Plaintiff requested to stay on estrogen but was willing to lower the dose. (Tr. at 236.) Plaintiff returned on January 8, 2003, for follow up on lab work, and noted that Motrin was effective for her low back pain. (Tr. at 235.)

A March 18, 2003, note indicates that plaintiff underwent a colonoscopy on March 5, 2005, which was within normal limits. She complained of bunions and requested a podiatry referral. The doctor assessed her as permi-menopausal, provided a podiatry referral and, it appears, prescribed a lower dose of Premarin with the goal of discontinuing estrogen. (Tr. at 235.)

On June 18, 2003, plaintiff complained of itchy eyes and sneezing. The doctor diagnosed allergic rhinitis and provided Zyrtec. (Tr. at 234.)

On September 20, 2004, plaintiff complained of joint pain, particularly in the knees, as well as influenza symptoms. (Tr. at 231.) Dr. Shubhangi Lodd assessed COPD, providing Albuterol and Advair; allergic rhinitis, providing Zyrtec; and joint pain, ordering knee x-rays and an arthritis panel and prescribing Naproxen.[7] (Tr. at 232.) The arthritis panel appears to have been negative. (Tr. at 240.) On October 11, 2004, plaintiff returned for the results of the x-rays, which showed normal knees. (Tr. at 229, 230, 247.) Dr. Lodd ordered an MRI. (Tr. at 230.)

On October 25, 2004, plaintiff was seen for her annual gynecology visit. Her current medications were listed as Zyrtec, Naproxen, Albuterol, and Advair. She noted smoking ½ to

---

[7]Prescription naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526/.

one pack per day, with occasional cocaine use, for which she had been in treatment several times. (Tr. at 228.) The note states: "She has no complaints." (Tr. at 233.) Plaintiff was alert and oriented, in no acute distress. As is relevant to the conditions at issue in her social security applications, plaintiff was diagnosed with probable hypertension, about which she was to follow up with her primary physician. (Tr. at 233, 249.)

On October 29, 2004, plaintiff complained of shortness of breath, chills, sweats, and body aches for two days. She was diagnosed with an acute upper respiratory infection/bronchitis/COPD and prescribed an Albuterol inhaler and Zyrtec for allergic rhinitis. (Tr. at 225-27.)

On November 9, 2004, plaintiff was seen complaining of acute low back pain and a right foot bunion. The doctor provided Naproxen and Flexeril and a referral to podiatry. The note further indicated that the knee MRI previously requested had been denied by GAMP.[8] (Tr. at 223-24.)

On May 31, 2005, plaintiff complained of right shoulder, bilateral knee, and left hip pain. The doctor provided Motrin. (Tr. at 221.)

On June 8, 2007, plaintiff was seen regarding bilateral knee pain. The doctor assessed arthritis, prescribing Vicodin, and ordered an osteoporosis screening (Tr. at 220), which revealed normal bone density (Tr. at 250).

On September 10, 2007, plaintiff complained of vaginal discharge. (Tr. at 269-70.) No

---

[8]The General Assistance Medical Program ("GAMP") provides health care coverage to indigent persons residing in Milwaukee County who are not eligible for any other public assistance programs providing medical benefits and are not covered under private insurance. http://www.statecoverage.org/files/Milwaukee%20County%20General%20Assistance%20Medical%20Program.pdf.

6

other issues were mentioned.

On January 10, 2008, plaintiff requested medication refills and complained of low back pain of long standing. She was provided Vicodin for low back pain, Clonidine[9] for vasomotor instability,[10] and Mirapax for restless leg syndrome. (Tr. at 322.) On April 11, 2008, those medications were continued. (Tr. at 321.)

On June 19, 2008, Dr. Christopher Withers saw plaintiff regarding her complaints of leg pain, providing Vicodin, and restless leg syndrome, providing Mirapax. He also prescribed Clonidine for vasomotor instability. (Tr. at 320.) On October 3, 2008, plaintiff told Dr. Withers that the Mirapax was working splendidly. (Tr. at 319.)

On January 27, 2009, plaintiff saw Dr. Withers requesting a refill of her prescriptions. It appears that she was provided Vicodin for low back pain and Clonidine for vasomotor instability. (Tr. at 315.)

On June 11, 2009, plaintiff returned to Dr. Withers complaining of right knee instability. (Tr at 314.) A June 16, 2009, MRI revealed early degenerative changes, a grade II tear of the posterior horn of the lateral meniscus, and mild joint effusion extending into the medial and lateral recesses of the suprapatellar bursa. (Tr. at 313.)

On November 2, 2009, plaintiff saw Dr. Withers complaining of bilateral knee pain and chest pain. It is unclear what treatment he provided. (Tr. at 312.)

On November 9, 2009, Dr. Withers completed a questionnaire, indicating that he treated

[9]Clonidine is used alone or in combination with other medications to treat high blood pressure. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000623/.

[10]Vasomotor instability refers to constriction or dilation of blood vessels. Stedman's Medical Dictionary 1933 (27th ed. 2000). It may be associated with hot flashes and night sweats. http://en.wikipedia.org/wiki/Menopause.

plaintiff for degenerative joint disease of the right knee. As symptoms, he listed daily pain, aggravated by prolonged standing or walking. As clinical findings, he listed ligament laxity/swelling. Plaintiff received medicinal treatment, with a side effect of drowsiness. (Tr. at 306.) Dr. Withers identified no emotional or psychological factors/conditions affecting plaintiff's physical condition. He opined that her pain would often be severe enough to interfere with attention and concentration, although she was capable of low stress jobs. (Tr. at 307.) He wrote that she could walk ½ block without rest or severe pain, sit for twenty minutes at one time, stand for five minutes at one time, stand/walk less than two hours in an eight hour day, and sit about two hours in an eight hour day. (Tr. at 307-08.) He further opined that she needed a job that permitted shifting positions at will from sitting to standing or walking, and required unscheduled breaks every hour, lasting about ten minutes, and the use of a cane with occasional standing/walking. She could rarely lift less than ten pounds, never more. (Tr. at 308.) She could rarely twist, and never stoop, crouch, or climb ladders or stairs. Dr. Withers imposed no significant limitations in repetitive reaching, handling, or fingering. He concluded that her impairments would likely produce good and bad days, and she would likely be absent about three days per month. (Tr. at 309.)

On December 14, 2009, plaintiff saw Mindy Ganke, PA-C, complaining of bilateral knee pain right greater than left. Examination of the right knee revealed tenderness in the medial joint line and lateral tenderness in the lateral joint line. Knee range of motion was just short of full extension to approximately 120 degrees of flexion. She was ligamentously stable. Exam of the left knee showed very mild tenderness over the medial joint line with no significant lateral or patellofemoral tenderness to palpation. X-rays revealed mild to moderate patellofemoral degenerative changes with no significant medial or lateral degenerative change, and no

8

fracture or dislocation. They discussed treatment options, including a possible injection. Plaintiff was to bring her MRI to the next visit and undergo a rheumatoid panel and serum studies (Tr. at 317), but that is where the treatment notes in the record end.

The SSA also arranged for plaintiff's claim to be analyzed by several consultants. On August 15, 2007, Dr. Donna Davidoff evaluated plaintiff's physical condition, with plaintiff complaining primarily of hand and leg pain. Plaintiff indicated that she dropped things and felt cramping in her wrists and thumbs, and that she could not stand or walk too long and at night her legs cramped and her knees felt swollen. (Tr. at 259.) Her past medical history included emphysema, low back pain, and high blood pressure for which he took medication. Her medications included Clonidine (for high blood pressure) and Hydrocodone for pain. She also used over-the-counter pain medications. Plaintiff reported smoking for many years, currently about two packs per week. She reported cocaine use in the 1980s, for which she went into rehab, and had been clean ever since. Her highest level of education was 10th grade; she studied for her GED while in rehab but never achieved one. She reported currently living with an elderly gentleman; in exchange for keeping the house and doing some cooking, she got free rent. (Tr. at 260.) The man's son, who lived next door, did the grocery shopping. (Tr. at 260-61.) Physical examination of the upper extremities showed no focal muscular atrophy or asymmetry. Range of motion was full, and reflexes were 2+ and symmetrical. There was a positive Tinel's over both right and left median nerves at the wrist, not at the elbows. Sensation to pinprick was diminished in the thumb, index and middle fingers. In the lower extremities, there was no warmth, redness, or effusion of the knees or the ankles. Range of motion was full although movement of the knees was painful. Focusing on the knees, there was no

evidence of ligamentous laxity or instability, nor any crepitus with flexion or extension.[11] Strength in the lower extremities was in the good plus to normal range and sensation was intact. In the standing position, she bore weight equally on both legs, and no gross alignment problems of the spine were seen. She had vague tenderness over the paraspinal muscle masses when she did lateral bending to either side. She achieved full forward flexion with the ability to touch her toes without any undue discomfort. She was able to raise on heels, raise on toes, and maintain single limb support without major difficulty. She was able to do a full squat with a great deal of pain and needed to use her hands to come back to standing. Her gait was independent without assistive devices and no major abnormalities were seen. Dr. Davidoff ordered x-rays of the right ankle and right knee, which showed no evidence of fracture or dislocation. (Tr. at 257-58, 261.) Dr. Davidoff assessed probable bilateral carpal tunnel syndrome, a history of knee and ankle pain, a history of low back pain, and hypertension. (Tr. at 261.)

On August 23, 2007, Jeremy Meyers, Ed.D., completed a mental status evaluation for the SSA. Plaintiff arrived at her appointment acceptably dressed and appearing to be her stated age of sixty-one, although she walked rather slowly and displayed a slight limp, using a cane while ambulating. Plaintiff was pleasant and communicative, expressed herself well, and did not present as particularly despondent, although on a couple of occasions she did become tearful. (Tr. at 263.) She was not currently seeing a psychiatrist and took no prescription medications; nor did she have a history of hospitalizations for psychiatric reasons. Plaintiff's chief complaint was arthritis in her knees and ankles, back pain, and emphysema.

---

[11]In this context, crepitus refers to the grating of a joint. Stedman's Medical Dictionary 424 (27th ed. 2000).

(Tr. at 264.) Plaintiff reported that she slept for only five to six hours because of pain. Because of that limited amount of rest, she was tired most of the time and her energy level was low. She described feelings of worthlessness over not being able to find a job and having no money. She indicated that she preferred to be by herself and withdrew from people. She experienced crying spells about twice per week, and although she thought about suicide she denied a history of attempts. Somatic complaints were significant principally for pain and reported fatigue. (Tr. at 265.) She was able to maintain attention for an enjoyed activity, such as watching TV, for an hour before feeling a need to go on to something else. Dr. Meyers opined that plaintiff was able to perform activities of daily living, although not always in a timely manner. Plaintiff advised that her ability to perform job-related tasks had declined because of physical problems principally. (Tr. at 266.) Dr. Meyers diagnosed mood disorder, depression, with a GAF of 50,[12] and offered only a guarded prognosis for significant near term gain. Plaintiff appeared to have the ability to understand, remember and carry out simple instructions so long as significant physical effort was not required. Dr. Meyers indicated that she should be able to respond appropriately to supervisors and co-workers, and maintaining concentration and attention should be manageable. Meeting work pace demands may from time to time be difficult because of pain, but she should be able to withstand routine work stress and adapt to

---

[12]"GAF" – the acronym for "Global Assessment of Functioning" – rates a person's psychological, social, and occupational functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms, 31-40 some impairment in reality testing, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others. Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32–34 (4th ed. 2000).

changes. (Tr. at 267.)

On September 21, 2007, Dr. Pat Chan completed a physical residual functional capacity ("RFC") assessment report based on a review of medical records, finding plaintiff capable of medium work with no other limitations. (Tr. at 271-78.) On September 24, 2007, Keith Bauer, Ph.D., completed a psychiatric review technique form, finding no severe mental impairment. Dr. Bauer considered the evidence of depression, but he found no restriction of activities of daily living; no difficulty in social functioning; mild difficulty in concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 279-92.) On January 28, 2008, Dr. Syd Foster completed a physical RFC assessment form, finding plaintiff capable of medium work with fingering limited to frequent (not constant), and no concentrated exposure to fumes, odors, dusts, gases, etc. (Tr. at 297-304.)

## II. THE ALJ'S DECISION

On January 27, 2010, the ALJ issued an unfavorable decision. (Tr. at 15.) Following the familiar five-step procedure for evaluating disability claims, see McKinzey v. Astrue, 641 F.3d 884, 888 (7th Cir. 2011),[13] the ALJ determined at step one that plaintiff had not worked since her alleged disability onset date and, at step two, that she suffered from the severe

_____

[13]The first step considers whether the claimant is working, i.e., engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the claimant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses the claimant's residual functional capacity ("RFC") and ability to engage in past relevant work. If the claimant can engage in past relevant work, she is not disabled. The fifth step assesses the applicant's RFC, as well as her age, education, and work experience to determine whether she can engage in other work. If the applicant can engage in other work, she is not disabled. Craft v. Astrue, 539 F.3d 668, 674 (7th Cir. 2008).

12

impairments of bilateral carpal tunnel syndrome, COPD, and degenerative joint disease of the right knee. (Tr. at 20.) The ALJ found plaintiff's left knee pain, low back pain, depression, and high blood pressure non-severe. The high blood pressure was controlled by medication, and plaintiff's depression caused no more than minimal limitation in plaintiff's ability to perform basic mental work activities. In making the latter finding, the ALJ found no limitation in activities of daily living, noting that plaintiff lived independently, cared for her personal needs, cooked, shopped, and cleaned, and used public transportation without any assistance. In the area of social functioning, the ALJ also found no limitation, noting that although plaintiff reported having few friends and preferred to be alone, she visited with family regularly and had at least one close friend. In the area of concentration, persistence, and pace, the ALJ found mild limitations, noting that plaintiff reported not sleeping well, watching television for an hour before losing interest, and suffering pain that interfered with her persistence and pace. Finally, the ALJ noted that plaintiff experienced no episodes of decompensation of extended duration and had never been hospitalized for depression. (Tr. at 21.)

At step three, the ALJ found that plaintiff did not have an impairment that met or equaled one of the Listings. At step four, he found that plaintiff retained the RFC for medium work, with additional limitations of no more than frequent bilateral fingering; occasional climbing of ladders, ropes, or scaffolds; occasional stooping, crouching, kneeling, or crawling; and "no more than concentrated exposure to irritants such as fumes, odors, dust, or gases." (Tr. at 22.) The ALJ considered plaintiff's testimony, finding it "not fully credible" (Tr. at 23), and rejected Dr. Withers's report suggesting greater limitations in favor of the opinions from the consultative physician and psychologist, and the state agency physician who concluded that plaintiff could perform medium work. (Tr. at 24.)

13

Based on this RFC, the ALJ found that plaintiff retained the ability to perform her past work as a machine feeder and assembler, as actually and generally performed. He further relied on the VE's testimony that this past relevant work would be included in the kinds of work plaintiff could still perform. (Tr. at 24.) In the alternative, and again relying on the VE, the ALJ found at step five that plaintiff could perform other jobs, such as cafeteria attendant, production helper, and packer/packager. (Tr. at 25.) The ALJ accordingly found plaintiff not disabled and denied her application. (Tr. at 26.)

Plaintiff sought review by the Appeals Council, but the Council declined her request. (Tr. at 5.) This action followed.

### III. DISCUSSION

### A. Standard of Review

Where, as here, the Appeals Council declined review, the ALJ's decision is treated as the final decision of the Commissioner of Social Security for purposes of judicial review. Scott, 647 F.3d at 739 (citing Getch v. Astrue, 539 F.3d 473, 480 (7th Cir. 2008)). The court reviews the ALJ's decision to ensure that it is supported by substantial evidence and consistent with applicable law. Campbell v. Astrue, 627 F.3d 299, 306 (7th Cir. 2010); Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Castile v. Astrue, 617 F.3d 923, 926 (7th Cir. 2010). Under this standard, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997). The court may not re-weigh the evidence or otherwise substitute its judgment for that of the ALJ, but it must

nevertheless conduct a critical review of the record, ensuring that the ALJ adequately discussed the issues and built an accurate and logical bridge from the evidence to his conclusion, McKinzey, 641 F.3d at 889.  Because judicial review is confined to the reasons supplied by the ALJ, the Commissioner's lawyers may not later fill in any gaps in the ALJ's analysis.  See Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002).

## B.    Analysis

### 1.    Credibility

In assessing plaintiff's credibility, the ALJ started with this well-worn phrase:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.

(Tr. at 23.)  The Seventh Circuit has characterized this language, which routinely appears in ALJ decisions in this circuit, see, e.g., Pfund v. Astrue, No. 10-C-1145, 2011 WL 3844155, at *14 (E.D. Wis. Aug. 26, 2011) (collecting cases), as "meaningless boilerplate," Parker, 597 F.3d at 922; see also Martinez, 630 F.3d at 694; Spiva, 628 F.3d at 348.

For starters, such determinations run afoul of SSR 96-7p, which provides:

> The . . . decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

The Ruling requires ALJs to indicate which statements are credible and which are not, and to say why; a conclusory statement that the testimony is "generally credible," or not "entirely credible," or credible only to the extent that it supports the ALJ's other findings, will not do.  See

Spiva, 628 F.3d at 348.  Further, such findings turn "the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating . . . credibility as an initial matter in order to come to a decision on the merits." Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 788 (7th Cir. 2003).[14]

In the next paragraph of his decision in this case, the ALJ stated that plaintiff's "allegations about the intensity, persistence, and limiting effects of her symptoms are not fully credible." (Tr. at 23.)  This too is contrary to law.  See Spiva, 628 F.3d at 648 (noting that such findings fail to explain which statements are not credible and what exactly "not fully" or "not entirely" credible is meant to signify).  The ALJ went on to provide some reasons for this finding, but most were based on the lack of objective medical support for plaintiff's claims. Where, as here, the ALJ finds that the claimant's impairments could produce the symptoms alleged, he "cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record." Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009) (citing SSR 96-7p).  Rather, the ALJ must consider the entire record, including the claimant's daily activities; the frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, for relief of symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

The ALJ noted the absence of diagnostic tests showing that plaintiff had carpal tunnel

---

[14]There is nothing wrong with plugging into a decision boilerplate statements of law; doing so saves time for busy ALJs (and district judges).  But the above quoted boilerplate purports to be a credibility finding specific to the case.

syndrome and the limited treatment she received for this problem. (Tr. at 23.) However, Dr. Davidoff, the SSA's own expert, diagnosed carpal tunnel, and the ALJ failed to explain what sort of further treatment a claimant with credible symptoms would have received. <u>See</u> <u>Dominguese v. Massanari</u>, 172 F. Supp. 2d 1087, 1096 (E.D. Wis. 2001) (rejecting reliance on limited treatment where the record contained no evidence and the ALJ made no finding concerning how regularly or how often a patient experiencing the plaintiff's stated level of pain would be expected to see a doctor). Nor did he consider any possible explanations for limited treatment, such as poverty. <u>See</u> SSR 96-7p ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

The ALJ further noted that although plaintiff complained of disabling knee pain an MRI showed only mild degenerative changes, and plaintiff received only minimal treatment for her knee problems. (Tr. at 23-24.) The ALJ similarly noted that plaintiff's complaints of low back pain were sporadic, and no diagnostic tests had been done to try to locate the cause of the pain. (Tr. at 24.) Again, while lack of objective medical support is a consideration, it cannot be the only one, and the ALJ failed to explore possible reasons for limited treatment or diagnostic testing.[15]

The ALJ also stated that, despite shortness of breath related to COPD, plaintiff continued to smoke two packs of cigarettes per week, suggesting that her symptoms were not

---

[15]I note that at one point plaintiff's doctor requested an MRI, but her insurance refused to cover it. (Tr. at 223-24.)

as severe as alleged. (Tr. at 24.) The ALJ said that, even though she continued to smoke, plaintiff's emphysema was fairly well-controlled by medication. (Tr. at 24.) However, the ALJ made no finding of a link between plaintiff's smoking and her alleged symptoms; nor did he acknowledge that, "[g]iven the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health." Shramek v. Apfel, 226 F.3d 809, 813 (7th Cir. 2000).

## 2. Treating Source Report

Plaintiff's treating physician, Dr. Withers, imposed significant limitations on plaintiff's ability to stand, sit, lift, and maintain regular attendance, which would, if accepted, require a finding of disability. The ALJ rejected this opinion, but the extent of his analysis was to state that the report "relies heavily on [plaintiff's] subjective reports and is inconsistent with other substantial evidence in the record, including the lack of objective evidence to support such limitations." (Tr. at 24.) He instead gave "greater weight" to the consultative physician and psychologist, and the state agency physician who concluded that plaintiff could perform medium work. (Tr. at 24.)

A treating doctor's opinion must be given "controlling weight" if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); see also Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ must always offer "good reasons" for discounting the opinion of a treating physician. Scott, 647 F.3d at 739. Even if there are sound reasons for refusing to give a treating physician's assessment less than controlling weight, the ALJ must still determine what value the assessment does merit. Id. at 740. "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship,

18

frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." <u>Moss</u>, 555 F.3d at 561.

The ALJ's decision fails under these standards. The ALJ stated that the report relied on plaintiff's subjective reports, but he failed to explain how that was so. The report itself lists as clinical findings and objective signs "ligament laxity/swelling." (Tr. at 306.) Nor, as discussed above, did the ALJ adequately explain why plaintiff's subjective complaints – if Dr. Withers indeed relied on them – lacked credibility. The ALJ further found the report inconsistent with other substantial evidence, but he cited no such evidence. <u>See</u> <u>Samuel v. Barnhart</u>, 295 F. Supp. 2d 926, 949 (E.D. Wis. 2003) (explaining that the treating source rule presumes the opinion's prominence and requires the ALJ to search the record for inconsistent evidence in order to give the opinion less than controlling weight). The ALJ decided to give greater weight to the consultive physician and state agency physicians, but he failed to explain, consistent with SSR 96-6p, why those reports were more persuasive. The state agency physicians, like the ALJ, found plaintiff capable of medium work, but such reports, standing alone, do not constitute substantial evidence justifying the rejection of a treating source's opinion. <u>Gudgel v. Barnhart</u>, 345 F.3d 467, 470 (7th Cir. 2003).

In his response, the Commissioner provides three pages of reasons why the Withers report should be rejected (R. 13 at 14-16), none of which were mentioned by the ALJ. I cannot consider these post-hoc arguments now. <u>See</u> <u>Steele</u>, 290 F.3d at 941; <u>see also</u> <u>Spiva</u>, 628 F.3d at 353 ("The government seems to think that if it can find enough evidence in the record to establish that the administrative law judge <u>might</u> have reached the same result had she considered all the evidence and evaluated it as the government's brief does, it is a case of harmless error.").

19

### 3.    Issues for Remand

The ALJ found plaintiff's mental impairment non-severe. (Tr. at 21.) Plaintiff notes that the ALJ appeared to rely on the report from Dr. Meyers, yet he skipped portions of the report favorable to her position, including the GAF of 50, her reported inability to perform daily activities in a timely manner, and her tendency to isolate. Dr. Meyers found serious symptoms and a limitation to simple, routine work, yet the ALJ found her mental impairment non-severe and omitted this limitation from the RFC.

In his response, the Commissioner notes the paucity of evidence pertaining to plaintiff's mental impairment. She received no mental health treatment post-onset, and the record contains no evidence from any treating source on this issue, just the reports from Dr. Meyers and Dr. Bauer (who, like the ALJ, found no severe mental impairment). Dr. Withers, who produced the only treating source report in this case, indicated that plaintiff had no psychological or emotional limitations. The Commissioner further argues that even if the ALJ erred in finding plaintiff's mental impairment non-severe, the error was harmless because the ALJ found other severe impairments at step two and continued with the sequential evaluation process.

The ALJ did not specifically credit the reports from Drs. Bauer and Withers on this issue, so I may not rely on those reports to uphold the ALJ's decision now. However, the ALJ did note that plaintiff had never been hospitalized and received no medication or treatment for depression.[16] (Tr. at 21, 24.) While not dispositive, the absence of medical evidence does

---

[16]Plaintiff notes in reply that the ALJ cited the lack of treatment and Dr. Meyers's report later in his opinion (see Tr. at 23-24), not in finding the mental impairment non-severe (Tr. at 21). However, I read the ALJ's decision as a whole. See Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("Because it is proper to read the ALJ's decision as a whole, and because

support the ALJ's conclusion.  <u>See, e.g.</u>, <u>Denton v. Astrue</u>, 596 F.3d 419, 424 (7th Cir. 2010) ("Denton bears the burden of producing medical records showing her impairment, and if she never sought medical treatment for a condition, then she cannot meet that burden.").  In any event, as the Commissioner notes, any error in finding a particular impairment non-severe may be deemed harmless if the ALJ continued with the five-step process and accounted for any limitations arising from that impairment in setting RFC.  <u>See</u> <u>Ramos v. Astrue</u>, 674 F. Supp. 2d 1076, 1091 (E.D. Wis. 2009).  While the ALJ failed to include simple, routine work in his RFC determination, he did include this limitation in his questions to VE, and the VE testified that adding such a limitation would not change her answers.  (Tr. at 51.)  <u>See, e.g.</u>, <u>McAnally v. Astrue</u>, 241 Fed. Appx. 515, 519 (10th Cir. 2007) (finding error in failing to include certain limitations in the RFC harmless where the VE testified that such limitations would not change the result).

Plaintiff argues in reply (Pl.'s Reply Br. at 3-4) that inclusion of "simple, routine, repetitive" work in a hypothetical question does not solve the problem.  <u>See</u> <u>Stewart v. Astrue</u>, 561 F.3d 679, 684-85 (7th Cir. 2009) (holding that a restriction to "simple, routine tasks" did not account for documented limitations in concentration, persistence, and pace).  But this confuses the issue.  In her main brief, plaintiff faulted the ALJ for finding the impairment non-severe, despite Dr. Meyers's limitation to simple, routine work.  The Commissioner noted in response that the error was harmless because the VE found that exact limitation irrelevant to the jobs she identified.  This is not a case like <u>Stewart</u> (or the cases cited there, including <u>Young v.</u>

─────────────────────

it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five, we consider the ALJ's treatment of the record evidence in support of both his conclusions at steps three and five.") (internal citation omitted).

<u>Barnhart</u>, 362 F.3d 995, 1004 (7th Cir. 2004)), where the Commissioner tried to argue that a limitation to "simple" tasks accounted for documented impairments in concentration or memory. Plaintiff cites no such evidence here, and Dr. Meyers found that "maintaining attention and concentration should be manageable." (Tr. at 267.)

Plaintiff further complains that the ALJ provided limited explanations for finding no or mild limitations in mental functioning. (Tr. at 21.) The ALJ's discussion is admittedly brief and somewhat conslusory; however, the law requires only minimal exposition, <u>see</u> <u>Berger v. Astrue</u>, 516 F.3d 539, 545 (7th Cir. 2008), and this would likely not constitute an independent basis for reversal and remand. Plaintiff also cites portions of Dr. Meyers's report the ALJ failed to mention, but an ALJ need not discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability. <u>Jones v. Astrue</u>, 623 F.3d 1155, 1162 (7th Cir. 2010). The ALJ discussed Dr. Meyers's report – the only piece of evidence plaintiff relies on now – specifically citing Dr. Meyers's finding that plaintiff retained the ability to understand, remember, and carry out simple instructions; respond appropriately to supervisors and co-workers; and maintain concentration and attention. (Tr. at 24, 267.) These are the basic mental demands of competitive, remunerative, unskilled work, <u>see</u> SSR 85-15, the type of jobs the VE identified.

Nevertheless, because the matter must be remanded based on the errors discussed above, the ALJ should reconsider the inclusion of possible mental limitations in the RFC as well. The ALJ should also consider plaintiff's use of a cane, as noted by Dr. Meyers (Tr. at 263) and Dr. Withers (Tr. at 308), <u>see</u> SSR 96-9p (noting that the need for a cane may erode the occupational base for even sedentary work); and better explain the basis for any limitations on plaintiff's use of the hands. He must also provide and explain appropriate limitations based

on plaintiff's COPD; as plaintiff notes, the ALJ's limitation to "no more than concentrated exposure to irritants" (Tr. at 22) makes little sense.[17]

The ALJ must on remand also confront and resolve the admitted errors at steps four and five. As indicated above, the ALJ found at step four that plaintiff could return to her past relevant work as a machine feeder and assembler, as generally and actually performed. (Tr. at 24.) However, as the Commissioner seems to concede, it appears that the assembler position was in fact a "composite job" performed for various temporary services, not a single job that plaintiff performed in the past. Given this uncertainty, the ALJ could not have accurately specified the duties involved in this prior job and assessed plaintiff's ability to perform the specific tasks. See Nolen v. Sullivan, 939 F.2d 516, 519 (7th Cir. 1991).[18]

As the Commissioner also seems to concede, the VE's step five testimony about other jobs plaintiff could perform conflicted with the DOT, despite her claim of consistency. (Tr. at 53.) The VE said plaintiff could work as a cafeteria attendant (DOT code 311.677-010), packer/packager (DOT code 920.587-018), and production helper (DOT code 619.686-022). (Tr. at 25.) The production helper job is classified by the DOT as heavy rather than medium work,[19] and thus beyond plaintiff's RFC. Similarly, the packer job requires constant reaching, handling, and fingering, which also exceeds the RFC. (R. 11, Ex. 2.) The cafeteria position

---

[17]The ALJ may have been attempting to incorporate Dr. Foster's opinion that plaintiff "avoid concentrated exposure" to irritants (Tr. at 301), but he phrased the limitation poorly. How can exposure to dust or fumes be more than "concentrated"?

[18]The Commissioner notes that plaintiff makes no similar challenge regarding the machine feeder position. However, plaintiff has argued that the RFC is flawed, based on the errors discussed above, and that the ALJ failed to engage in a proper analysis under Nolen regarding this job as well.

[19]http://www.occupationalinfo.org/61/619686022.html.

appears to be a light job,[20] and it is unclear why the ALJ would rely on such a position given plaintiff's purported RFC for medium work. Plaintiff notes that, under the Grid, a person of her age limited to light or sedentary work would be declared disabled.

The Commissioner argues that the ALJ fulfilled his obligation to inquire about consistency with the DOT under SSR 00-4p, and that plaintiff's counsel failed to object at the time, waiving any challenge. The Seventh Circuit has held that in this situation, where counsel failed to identify conflicts during the hearing, the plaintiff must show that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance. <u>See Overman v. Astrue</u>, 546 F.3d 456, 463 (7th Cir. 2008). Plaintiff argues in reply that these conflicts were indeed obvious, but I need not resolve that issue. The matter must be remanded based on the errors discussed above, and the parties agree that the ALJ and the VE erred at step five. The ALJ must reconsider these issues and obtain appropriate vocational testimony on remand.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Plaintiff asks that I recommend re-assignment of the case to another ALJ. She argues that no reasonable person could find her capable of medium work, and that the ALJ's ruling was a result-oriented attempt to avoid a disability finding under the Grid. However, I see no evidence of an "unshakable commitment to denial" here. <u>Sarchet v. Chater</u>, 78 F.3d 305, 309

---

[20]http://www.occupationalinfo.org/31/311677010.html.

(7th Cir. 1996).  Nor is this a situation where the ALJ has produced multiple defective opinions, suggesting that remand would produce more of the same.  See, e.g., Ramos, 674 F. Supp. 2d at 1094-95.  As discussed above, the ALJ made (common) errors in this case, and the Commissioner is free to reassign the case if he wishes, but I leave that matter to his discretion.

Dated at Milwaukee, Wisconsin this 13th day of September, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge